An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 25-284

Filed 5 November 2025

Johnston County, No. 24JB010258-500

IN THE MATTER OF: J.C.R.

Appeal by Juvenile from orders entered 15 October 2024 and 17 October 2024 by Judge Travis N. Wheeler, in Johnston County District Court. Heard in the Court of Appeals 14 October 2025.

> *Attorney General Jeff Jackson, by Assistant Attorney General Caden William Hayes, for the State.*

> *Appellate Defender Glenn Gerding, by Assistant Appellate Defender Jillian C. Franke, for Juvenile-Appellant.*

WOOD, Judge.

Juvenile-Appellant ("Juvenile") appeals the trial court's 15 October 2024 order for adjudication and 17 October 2024 order for disposition finding him responsible for indecent liberties between children and placing him on probation for twelve months. After careful review, we affirm the trial court's order.

## I.  Factual and Procedural Background

On 12 February 2024, Mary's mother ("Mother") brought Mary,[1] her eight-year-old daughter, into the Clayton Police Department to report a previous incident. Mother and Mary met with Detective Mallett. Mother talked most of the interview; Mary "talk[ed] every now and again." Mother reported that on 10 February 2024, Mary confided to her that an incident occurred in a summer when Mary was three or four years old. According to Detective Mallett's interview with Mother, in approximately 2020, Mary was in the sole custody of her father who was living in Clayton with father's sister ("Aunt") and her son, Juvenile, whom Mother estimated to be fourteen years old at the time. When Father left the house either for work or to take the kids to school, Mary was left with Juvenile. Mary reported to Detective Mallett, "When I woke up, he was on me and I tried to push him off, but then he put his hands on mine and kept doing stuff." Mother further clarified to Detective Mallett that Mary reported that Juvenile held her down on the bed while groping and touching her for about an hour. He then went to his gaming chair, removed his pants and asked Mary to perform oral sex on him, which Mary refused to do.

Detective Mallett conducted computer searches to find previous addresses for Mary's father and Juvenile. He located an address for Juvenile through the school resource officer at his current high school. However, Detective Mallett did not obtain

---

[1] Pseudonyms are used to protect the identity of the juveniles pursuant to N.C. R. App. P. 42(b).

Juvenile's school records to determine where he previously attended school or where he resided at the time the alleged incident was to have occurred.

Mary was referred to the East Carolina University Tedi Bear Clinic for further evaluation. During her intake interview Mary provided additional details:

> I was in the room . . . staring at the tv. He was kissing me with his lips. He was almost raping me. He started putting his tongue to my tongue. . . . I tried to push him off and he grabbed my hands. He kept kissing me for like an hour.

Mary stated that he got off her and started playing Minecraft when she told him someone was at the door. Then she reported, "I said I wanted to play. He told me to suck his penis. I said no because he just went to the bathroom to go pee." When questioned by the interviewer, Mary stated that all their clothes were on when he was kissing her, but when he wanted her to suck his penis, he took his pants off and his penis looked hairy. Mary also stated "I think we had a camera in the room. That's when my Tia came and hit him with the belt." However, there was no other evidence presented about cameras. Also, during the interview when asked, "anybody else do this to you?" Mary reported that another cousin "maybe did it when I was 6 and he was 7."

On 5 April 2024, the State filed three juvenile petitions against Juvenile, felony first-degree statutory sexual offense on 1 June 2020, misdemeanor sexual battery on 1 January 2020, and misdemeanor indecent liberties between children on 1 June 2020.

On 14 October 2024, at the start of the adjudication hearing, the State informed the trial court that it was not proceeding on the three petitions filed 5 April 2024, but instead, the State intended to proceed on three new petitions filed that day. The new petitions alleged attempted felony first-degree statutory sexual offense with a date range of 14 March 2020 to 1 September 2020, misdemeanor sexual battery, and misdemeanor indecent liberties between children with both misdemeanors having a date range of 1 June 2019 until 1 September 2020. Juvenile's attorney executed a probable cause waiver and waived any timetable stating, "this had been a long time of us negotiating trying to get this to the table. I told him there's no need for him to have to formally send new petitions up and go through the whole process, given that it's not changing the nature of this case." The trial court ensured Juvenile had an opportunity to speak with his attorney and understood the new charges the State had filed against him prior to proceeding with the hearing.

At the hearing, Mary testified that she calls girls' private parts "girl parts" and boys' private parts "a thing." She then testified that she was in her room at Aunt's house when she was "four or three" when Juvenile touched both of her shoulders "putting me on the bed" and kissed her with his lips and tongue. She stated, "he[] grabbed my shoulder and he ke[pt] me on the bed with force and that's all I remember and then he stood up. He started playing Minecraft and I wanted to play too." When she asked if she could play too, he went to the bathroom, came back and then told her that first she had to suck his "thing." She noticed that his "thing" had hair on it.

- 4 -

When asked when this happened, Mary stated that it happened in "summer spring" because "there's flowers everywhere."

Mother testified that when Mary was three or four years old, she lived with her father on Casey Road in Clayton but may have been spending the night with Aunt. She stated she believed Juvenile was six years old when Mary was born. Mother recounted the events of 10 February 2024, stating that Mary told her Juvenile woke her up out of her sleep and "forced her on - - pinned her down [on] the bed and did inappropriate things to her face and her mouth." Mary reported it lasted thirty minutes to an hour and that she was only three years old, "[she] was just a baby. [She] could barely talk." Mary also told Mother that she told Aunt as best as she could, but nothing was done about it. Mother also testified to Mary's allegations about her other cousin touching her, Aunt's children watching porn, Mary smoking a cigarette at 1 year old and allegedly drinking beer, all of which Mother had reported to CPS throughout their custody dispute. Father and Mother now have equally shared custody.

There were significant inconsistencies in Mother's testimony. She stated that at the time of the incident she and father had equally shared custody. However, Detective Mallett testified that Mother reported she did not have custody at the time of the incident and that his investigation revealed that father had sole custody during that time. The forensic interviewer also testified that father had sole custody at the time. Additionally, Mother initially testified there was a six-year age difference

between Mary and Juvenile. However, when Juvenile's attorney pointed out that if that were true, Juvenile would have been nine years old at the time of the incident if Mary was three. Juvenile's attorney asked, "she said he had a hairy man part at nine?" Mother responded, "He could be older. I don't know his date of birth. He was probably like ten actually now that I remember" referring to Juvenile's age at the time of Mary's birth. The attorney continued "Okay. So if he was ten and she was three, he would have been 13 at the time, correct?" and Mother responded, "That makes more sense if he's going through puberty." The attorney then stated, "That would make him 18 or 19 now." Mother looked at him and responded, "That looks about right." In actuality, Juvenile was sixteen years old at the time of the hearing and is seven and a half years older than Mary. When Mary turned three years old, Juvenile would have been ten and a half years old.

Tori Blanchette ("Blanchette"), the forensic interviewer at Tedi-Bear Clinic testified concerning her interview with Mary. She noted that Mary was living with her father in Aunt's house at Oliver Street at the time of the incident. This contrasted with Mother's statements to Detective Mallett that the incident occurred in Clayton as well as Mary's statement that her dad was not living with Aunt at the time of the incident.

Doctor John Wright ("Dr. Wright"), a pediatrician at Tedi-Bear Clinic testified concerning his physical examination of Mary and his conclusions based on the full evaluation. Dr. Wright testified that on average children do not disclose sexual abuse

for six years after they experience it. He did not find any abnormalities on the physical examination, but he did not expect to find any. He stated that, in his opinion, the signs and symptoms Mary gave were consistent with a history of prior sexual abuse.

At the end of State's evidence, the State recalled Detective Mallett to review his investigation into Juvenile's background. Detective Mallett testified he had conducted database searches for addresses related to both Mary's father and Aunt with whom Juvenile lived. His search returned addresses located in Clayton and in Selma. Additionally, Detective Mallett noted he had found a Leland address for Aunt in New Hanover County. According to this particular search, she lived at the Leland address until 2022 when her address changed to an address in Selma. During cross examination, Detective Mallett confirmed that he had previously sent the prosecutor an email that stated up until 2022 he had a Leland address for Aunt.

At the close of State's evidence, Juvenile's attorney made a motion to dismiss on the basis that the newly amended petitions refer to 2019-2020 but the State presented evidence that Aunt lived in New Hanover County until 2022. The State concedes this evidence was not disclosed to Juvenile's attorney during discovery. Further, Juvenile's attorney argued the petitions allege that (1) the offense occurred at the Clayton address based on Mother's statements even though she did not have custody at the time, (2) the forensic interviewer stated Mary reported she and Dad were living with Aunt in Selma, (3) Mary testified that Dad was not living with Aunt

at the time of the incident, and (4) at trial the State presented evidence that Aunt lived in Leland during that timeframe.

The trial court denied the motion to dismiss. Juvenile's attorney did not present any evidence and renewed the motion to dismiss. She noted that the standard of review at the close of all evidence is beyond a reasonable doubt and there was serious doubt about when, where, and if anything occurred between Mary and Juvenile, especially given the inconsistencies in Mother's and Mary's testimonies.

Thereafter, the trial court engaged in a lengthy discussion with the attorneys concerning the differing time ranges for the various offenses and the age requirements related to those offenses. The State explained that it used a 14 March 2020 to 1 September 2020 date range for the felony charge because it requires the perpetrator to be at least twelve years old at the time of the offense and Juvenile would not have turned twelve until 14 March 2020. Meanwhile, the State used a 1 June 2019 to 1 September 2020 date range for the misdemeanor offenses because they do not have an age requirement. Juvenile's attorney argued that the misdemeanor sexual battery offense has a two-year statute of limitations but was filed four years after the alleged dates of the event. Subsequently, the trial court dismissed the misdemeanor sexual battery charge but denied Juvenile's motion to dismiss the two remaining claims.

The State gave its closing argument and the trial court continued to ask questions about the dates and ages of the children. Based on the alleged date ranges

of 14 March 2020 to 1 September 2020 for the felony charge, the trial court clarified Mary would have been between four years-five months old and four years-eleven months old and could not have been three years old. Additionally, prior to 14 March 2020 the Juvenile would have been only eleven years old, therefore the felony charge could not have applied. With these facts, the trial court determined that it could not "find beyond a reasonable doubt that the B2 felony would apply." The trial court found Juvenile delinquent for indecent liberties between children. The trial court stated, "the Court really has no doubt that it happened. There [are] just too many factors about [it] that are consistent in[cluding] the testimony [of] the officer, [] the testimony presented at Tedi-Bear [and] the testimony presented today."

The trial court conducted the disposition hearing on 16 October 2024 and entered a disposition of twelve months of probation with numerous provisions. Juvenile gave oral notice of appeal in court.

## II. Analysis

Juvenile raises three issues on appeal: (1) the State violated Juvenile's constitutional right to disclosure pursuant to *Brady v. Maryland*, (2) the trial court failed to protect Juvenile's right to discovery under N.C. Gen. Stat. § 7B-2405(5), and (3) alternatively, Juvenile received ineffective assistance of counsel where his attorney failed to file a motion for discovery under N.C. Gen. Stat. § 7B-2300(c).

### A. Brady Violation

"The prosecution's affirmative duty to disclose evidence favorable to a

defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with this Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 505 (1995). In *Brady,* the Supreme Court of the United States determined that prosecutors have an affirmative duty to reveal evidence favorable to a defendant when the evidence is material to either their guilt or their punishment. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215, 218 (1963). "Evidence is considered 'material' if there is a 'reasonable probability' of a different result had the evidence been disclosed." *State v. Berry,* 356 N.C. 490, 517, 573 S.E.2d 132, 149 (2002) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1565, 131 L.Ed.2d 490, 506 (1995)). The defendant is required to demonstrate that the government's failure to provide the evidence would "undermine[ ] confidence in the outcome of the trial." *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed2d 481, 491(1985). "Therefore, '[t]o establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial.'" *State v. Ballard*, 283 N.C. App. 236, 241, 872 S.E.2d 557, 562–63 (2022) (quoting *State v. McNeil*, 155 N.C. App. 540, 542, 574 S.E.2d 145, 147 (2002)).

In the case *sub judice,* the record reveals that the email in question, from Detective Mallett to the prosecutor which stated that up until 2022 he had a Leland

address for Aunt, was not provided to the defense attorney until the close of State's evidence at trial. However, the email contained only the fact that Aunt and Juvenile may have lived in Leland in New Hanover County until 2022. This Court previously has ruled that when "defendant was aware of the information prior to the district attorney obtaining the evidence and could have followed up on the statement at that point" there was not a *Brady* violation. *State v. Small*, 131 N.C. App. 488, 490, 508 S.E.2d 799, 801 (1998). While the State may have learned about the possibility of a Leland address for Aunt prior to trial, Juvenile and his mother, Aunt, would have had earlier and first-hand knowledge of those facts. Surely, they knew where they had resided during the relevant time periods and could have investigated its relevance further had they believed it to be beneficial to Juvenile's case. Therefore, we conclude Juvenile was not prejudiced by the State's failure to disclose the actual email, and it did not affect the outcome of the trial.

### B. Right to discovery under N.C. Gen. Stat. § 7B-2405(5)

Juvenile contends the trial court violated Juvenile's right to discovery under N.C. Gen. Stat. § 7B-2405(5) when it failed to dismiss the case for possible jurisdictional issues after the additional address was shared with Juvenile and the trial court. We disagree.

N.C. Gen. Stat. § 7B-2405 protects a juvenile's rights to ensure due process of law:

> The adjudicatory hearing shall be a judicial process

designed to determine whether the juvenile is undisciplined or delinquent. In the adjudicatory hearing, the court shall protect the following rights of the juvenile and the juvenile's parent, guardian, or custodian to assure due process of law:
> (1) The right to written notice of the facts alleged in the petition;
> (2) The right to counsel;
> (3) The right to confront and cross-examine witnesses;
> (4) The privilege against self-incrimination;
> (5) The right of discovery; and
> (6) All rights afforded adult offenders except the right to bail, the right of self-representation, and the right of trial by jury.

N.C. Gen. Stat. § 7B-2405 (2024). Juvenile states the trial court failed to protect his discovery rights under N.C. Gen. Stat. § 7B-2405(5). However, as expressed *supra*, the trial outcome was not impacted by a discovery violation. While the State failed to timely deliver an email to Juvenile's attorney during discovery, the content in the email was known to Juvenile and his parents. When a defendant is aware of the contested information and free to follow up with any investigation they choose, failure of the State to disclose the information does not qualify as a discovery violation. *Small*, 131 N.C. App. at 490, 508 S.E.2d at 801. Pursuant to N.C. Gen. Stat. § 7B-2405, the trial court was not required to dismiss under the facts of this case because no discovery violation occurred.

**C. Ineffective Assistance of Counsel**

Juvenile contends he received ineffective assistance of counsel because there is no evidence his attorney filed an explicit motion for discovery.

> In general, claims of ineffective assistance of counsel should be considered through motions for appropriate relief and not on direct appeal. This is so because on direct appeal, review is limited to the cold record, and the Court is without the benefit of information provided by defendant to trial counsel, as well as defendant's thoughts, concerns, and demeanor that could be provided in a full evidentiary hearing on a motion for appropriate relief.

*State v. Edgar*, 242 N.C. App. 624, 632, 777 S.E.2d 766, 771 (2015) (cleaned up). It is unclear from the cold record what, if any, discovery motions were filed by Juvenile's attorney. In addition, we have no knowledge as to what information Juvenile or his parents shared with his attorney about their living arrangements. Finally, we do not know to what extent Juvenile's attorney attempted to research the knowledge gaps as to when and where the alleged incident took place. As Juvenile's attorney pointed out during cross examination of Detective Mallett, the detective did not request Juvenile's school records from the time of the incident to determine where he was enrolled. However, Juvenile's attorney was free to have done so. With the limits of this Court's review in mind, we dismiss Juvenile's ineffective assistance of counsel claim without prejudice to preserve his right to reassert it through a motion for appropriate relief.

## III. Conclusion

After a careful review of the record, we affirm the trial court's adjudication order. The trial court did not err under *Brady* or N.C. Gen. Stat. § 7B-2405. We dismiss Juvenile's ineffective assistance of counsel claim without prejudice to

preserve his right to reassert it through a motion for appropriate relief. It is so ordered.

AFFIRMED IN PART, DISMISSED IN PART.

Judge STROUD and MURRY concur.

Report per Rule 30(e).